UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO GAITHER,

      Plaintiff,     Civil Action No. 19-13398

v.             Bernard A. Friedman
             United States District Judge

THOMPSON, *et al.*,      David R. Grand
             United States Magistrate Judge

        Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO DISMISS (ECF No. 26)

*Pro se* plaintiff Antonio Gaither ("Gaither"), an incarcerated person, brings this civil rights action pursuant to 42 U.S.C. § 1983, against employees of the Michigan Department of Corrections ("MDOC"). (ECF No. 1). An Order of Reference was entered on December 23, 2020, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (ECF No. 13).

On June 25, 2021, MDOC employees Lance Thompson, Tony Pankhurst, Kenneth Salisbury, and Donald Ricumstrict (collectively, "Defendants")[1] filed a Motion for Partial Summary Judgment on the Basis of Exhaustion and to Dismiss. (ECF No. 26). Gaither

_____

[1] On June 1, 2021, summonses for defendants David Michaels and Devyn Simmons were returned unexecuted because "[n]o one at this address is authorized to accept service for David Michaels and Devyn Simmons. David Michaels is deceased, and Devyn Simmons is an employee of Monroe County Parole Office." (ECF No. 22, PageID.108).

filed a response to this motion on July 12, 2021 (ECF No. 28), and Defendants filed a reply on August 23, 2021 (ECF No. 29).[2]

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. LR 7.1(f).  Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Partial Summary Judgment and to Dismiss **(ECF No. 26)** be **GRANTED IN PART AND DENIED IN PART**.

## II.     REPORT

### A.     Background

#### 1.  The Underlying Incidents

Gaither is a MDOC prisoner who is currently confined at the Macomb Correctional Facility in Lenox, Michigan.  He brings this § 1983 civil rights action, alleging violations of his First, Eighth, and Fourteenth Amendment rights, as well as state law claims of sexual assault, assault, battery, and forgery.  (ECF No.1, PageID.5).  At the time of the events at issue in his complaint, Gaither was housed at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan.

In his complaint, Gaither essentially alleges a series of events stemming from an

---

[2] While Gaither's response was dated July 12, 2021, his filing had not been docketed until August 9, 2021.  (7/12/2021 dkt. entry).

initial incident involving a retaliatory strip search on January 19, 2017, by Correctional Officer Lance Thompson ("Thompson"), which led to Gaither filing a grievance against him. (*Id.*, PageID.9-11, 17). As a result, Gaither asserts that Thompson, in collusion with Sergeant Tony Pankhurst ("Pankhurst"), Prison Counselor Devyn Simmons ("Simmons"), Deputy Warden Donald Ricumstrict ("Ricumstrict"), and Correctional Officers David Michaels ("Michaels") and Kenneth Salisbury ("Salisbury"), subjected him to a series of "retaliation, retaliatory misconduct, discriminatory harassment" for filing the grievance, including "4 strip searches, multiple cell searches, (shake-downs), [] placement in segregation (solitary confinement)," and ultimately a "retaliatory transfer" to Chippewa Correctional Facility ("URF") in July 2017. (*Id.*, PageID.11-12).

Specifically, Gaither alleges that, on January 19, 2017, Thompson stopped him and stated, "What the fuck is wrong with this picture? . . . . What's up with your coat? That's what's wrong with you people, all of you are sorry." (ECF No. 1, PageID.10). When Gaither said he would be filing a grievance against Thompson for his disrespectful and derogatory speech, Thompson responded:

> I shouldn't have to keep asking you dumb ass people to do the same shit over and over. Now you want to tell my supervisors and file grievances, huh? I'll show you. We will have you locked up, . . . I need a strip search, I'm going to embarrass you out here in front of your people and let the fags see your little dick and ass.

(*Id.*). According to Gaither, Thompson then conducted a "strip search" or "shake down," during which "Thompson reached his hands against my buttocks while [reaching] into my back pockets causing me to jerk while he grabbed my buttocks." (*Id.*, PageID.10-11). Gaither contends that Thompson "retaliated, assaulted, sexually assaulted [him], threatened

to continuously strip search and place [him] in punitive segregation in direct relation to [his] orally asserted 'protected conduct' of filing a grievance . . . [s]pecficially to punish, humiliate, degrade, and deter [him] from assertion of his constitutional rights." (*Id.*).  He asserts that, "on 1-19-17," he filed a Prison Rape Elimination Act ("PREA") grievance, "#ARF-1702-20019-PREA-P" (the "PREA Grievance").  (*Id.*, PageID.17).

Gaither further alleges that, later in April 2017, Pankhurst threatened and retaliated against him, stating, "You got Thompson facing sanctions, termination, moved and relocated from his assignment for that fucking grievance you filed in the previous months, you will learn, we stick together, by the time we finish trashing your house, strip searchin[g] you, you will think twice before filing another grievance."  (*Id.*, PageID.14). Pankhurst then allegedly placed him in segregation for a "3-4 hour period," during which Pankhurst "planted alleged contraband state property [in his cell, and] forged a false destruction of state property misconduct report during a 3 hour cell search . . . [for] which plaintiff received sanctions of 3 days L.O.P."  (*Id.*, PageID.14-15).  Gaither asserts that, though similarly situated prisoners are not normally taken to segregation during cell searches, he was taken to segregation during each cell search and placed in a "3x6 cage with a small stool, no access to a toilet, no water, [and] left at the mercy of staff," all in retaliation for filing the PREA Grievance.  (*Id.*, PageID.12, 15).

Gaither continues to allege that, on April 24, 2017, investigators of the PREA Grievance "simply rubber-stamped a botched investigation," which resulted in a finding of insufficient evidence to support Thompson's alleged conduct.  (*Id.*, PageID.17).  He asserts that Michaels then told him that "nothing" came out of "filing [the] PREA Grievance on

Thompson," that he should "think twice before [] pull[ing] that shit again," and that he was "going to the hole." (*Id.*). He alleges that Michaels and other sergeants escorted him to segregation, kept him handcuffed, began a strip search, and "assault[ed] him by forcefully removing [his] clothing from his body" in retaliation for filing a grievance. (*Id.*). Gaither contends that Defendants subjected him to these types of retaliatory strip searches at least "3 more times," even though prisoners in a "normal strip search" are asked to simply remove their clothing and hand it over to the officers for examination. (*Id.*).

Gaither further alleges that, on June 1, 2017, Salisbury forged a "False Notice of Intent to Conduct an Administration Hearing Report" and placed Gaither in segregation for five days straight until June 5, 2017, in retaliation for filing the PREA Grievance. (*Id.*, PageID.17, 19). He contends that the "Notice of Intent" stated in conclusory fashion that "Mr. Gaither has engaged in an unlawful act," without stating any specific factual allegations, and he never received an "Administrative Hearing, Hearings Investigator, documents or statements from witnesses to defend himself" from this false statement. (*Id.*, PageID.19). He alleges that "ARF Staff never intended to actually follow MDOC Policy & Procedure to classify plaintiff to segregation as no specific facts exist to support this process," and instead intended to keep him in segregation until he was transferred to URF. (*Id.*, PageID.20).

According to Gaither, after he was released from segregation on June 5th, he proceeded to ask Simmons why he had been detained in segregation and strip searched. (*Id.*, PageID.21). Simmons allegedly responded by stating, "What the hell are you doing out of the hole, Salisbury said he was keeping you in the hole until we transfer you to

[URF] for writing that grievance on Thompson . . . .  [Y]ou're gonna lose your job when your ass is up north and unable to see your family. . . .  Don't take it personal, it's what we do to all grievance writers."  (*Id.*).

Finally, Gaither alleges that, on July 20, 2017, Ricumstrict, in collusion with other Defendants, ultimately transferred him to URF in direct retaliation for his filing the PREA Grievance.  (*Id.*, PageID.22).  As a result, Gaither claims that he lost his "$70.00-$80.00 dollars a month prisoner wages from his high paying food service assignment," and that ARF has a "practice, pattern, custom" of submitting retaliatory transfers to URF for prisoners "who exercise their 1st Amendment Right to file grievances."  (*Id.*, PageID.12, 21).

Based on the allegations above, Gaither asserts that he sustained mental and emotional injuries and continues to suffer from psychological damage.  (*Id.*, PageID.23).  Accordingly, he sues Defendants in their individual and official capacities for, among other relief, monetary damages, as well as several "injunction[s]" ordering that: (1) he be transferred to a facility back in the Lower Peninsula of Michigan before his retaliatory transfer and reinstated to a position similar to his prior work assignment; (2) all defendants involved in his assault and/or sexual assault be terminated from employment; and (3) Salisbury be terminated for committing forgery.  (*Id*., PageID.23-24).

## 2.  Issues with Gaither's Grievances

Principally at issue in the Defendants' summary judgment motion is whether Gaither properly exhausted his grievances against them related to the foregoing incidents at ARF.  In his complaint, Gaither asserts that the MDOC grievance procedure covers his

claims of retaliation, cruel and unusual punishment, and due process and equal protection violations. (*Id.*, PageID.25). He asserts that, at ARF, he filed: (1) a "retaliatory transfer grievance #ARF-2017-08-1816-17B" (the "17B Grievance"), which he exhausted through Step III of the general grievance process; and (2) the PREA Grievance (ARF-1702-20019-PREA-P), which he exhausted through Step II of the PREA grievance process. (*Id.*, PageID.26-27). Notably, as to the PREA Grievance, he alleges that it was "initially filed [as] a [general] grievance which the facility converted to a PREA grievance." (*Id.*, PageID.27).

Attached to Gaither's complaint are copies of the PREA Grievance and Step II PREA Appeal Form, the MDOC's PREA Step II Decision,[3] as well as documents related to the 17B Grievance. (ECF No. 1, PageID.32-37).[4]

Defendants now move for partial summary judgment and dismissal on Gaither's claims against them, arguing that they are entitled to (1) dismissal of all claims against them in their official capacity based on Eleventh Amendment immunity, and (2) summary judgment on all but one claim of a retaliatory transfer, based on a failure to exhaust administrative remedies before filing the instant lawsuit.

---

[3] The attached copies of the PREA Grievance and Step II PREA Appeal Form appear to be either blank or contain a semblance of faint handwriting that has mostly faded away, making it impossible to decipher the substance of the grievance. (ECF No. 1, PageID.32-34). The PREA Step II Decision states that the allegations in the PREA Grievance "were appropriately investigated and a proper decision was rendered," so his "PREA Grievance Appeal is denied." (*Id.*, PageID.35).

[4] The details of Gaither's general grievance for a retaliatory transfer will be more fully addressed below in the analysis.

### B.    Standards of Review

#### 1.  Motion to Dismiss

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

When a court is presented with a motion testing the sufficiency of a complaint, "it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers.  *See Thomas v. Eby*, 481 F.3d 434, 437

8

(6th Cir. 2007).   Nonetheless, "[t]he leniency granted to pro se [litigants] . . . is not boundless," *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and "such complaints still must plead sufficient facts to show a redressable legal wrong has been committed." *Baker v. Salvation Army*, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

### 2.   Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).   A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.   *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).   "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"   *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

9

*Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action, "under [§ 1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court. *See Woodford*, 548 U.S. at 89. The Supreme Court has held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93. Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. In determining whether a plaintiff has properly exhausted his claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 200 (2007). Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof. *See id.* at 216; *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

In their motion, Defendants argue for (1) dismissal of Gaither's official capacity

claims against them based on Eleventh Amendment immunity; and (2) summary judgment on all claims against them (except for his retaliatory transfer claim) because he failed to properly exhaust his administrative remedies, as required by the PLRA. (ECF No. 26, PageID.104-11). The Court will address each argument in turn.

### 1. Dismissal of Official Capacity Claims

Defendants seek to dismiss Gaither's § 1983 claims against them in their official capacities based on Eleventh Amendment immunity. (ECF No. 26, PageID.148-49). In response to their motion, Gaither asserts that Defendants are not entitled to Eleventh Amendment immunity or "qualified immunity" because they violated his "clearly established" First, Eighth, and Fourteenth Amendment rights. (ECF No. 28, PageID.176). Defendants subsequently reply that Gaither failed to address their clear entitlement to Eleventh Amendment immunity. (ECF No. 29, PageID.183).

The Eleventh Amendment prohibits suit in federal court against the state or any of its agencies or departments unless the state has waived its sovereign immunity. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Relevant to this case, the Sixth Circuit has specifically held that MDOC employees are entitled to sovereign immunity from official capacity § 1983 claims:

> Because sovereign immunity extends to state instrumentalities, and the MDOC is an arm of the State of Michigan, the MDOC is entitled to sovereign immunity on the § 1983 claim as well. Moreover, the named Defendants, in their official capacities, are similarly entitled to immunity with respect to [Plaintiff's] § 1983 claim because a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office, which is no different from a suit against the State.

11

*McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010) (internal citations and quotations omitted).

Here, the law is clear that sovereign immunity applies to claims against Defendants in their official capacity as MDOC employees. However, one exception to Eleventh Amendment immunity is where the plaintiff's "suit against a state official seek[s] prospective injunctive relief to end a continuing violation of federal law," *see Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted), which is the case here with Gaither's complaint. (ECF No. 1, PageID.23-24); *see also Ex parte Young*, 209 U.S. 123 (1908).

The Supreme Court has stated that "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) (rejecting arguments that a claim could not be brought under *Ex parte Young* because the alleged violation "was probably *not* inconsistent with federal law" or actually governed by state law); *see Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law . . . is ordinarily sufficient"). Rather, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (alteration in original) (quoting *Verizon*, 535 U.S. at 645). Notably, the Sixth Circuit has generally held that "claims for reinstatement are prospective in nature and appropriate subjects for *Ex parte Young* actions." *Diaz v. Mich. Dep't of Corrs.*, 703 F.3d 956, 964 (6th Cir. 2013) (quoting *Carten*,

12

282 F.3d at 396).

As an initial matter, Gaither apparently misinterprets Defendants' assertion of Eleventh Amendment sovereign immunity, given that the gravamen of his response brief disputes their entitlement to "qualified immunity" based on violations of his "clearly established rights."  These arguments are misguided, as Eleventh Amendment sovereign immunity is separate and distinct from qualified immunity (which Defendants have not raised in this case).

On the other hand, in seeking dismissal of Gaither's official capacity claims, Defendants do little more than recite boilerplate law on Eleventh Amendment immunity (*see* ECF No. 26, PageID.148-49), without even mentioning the fact that Gaither seeks injunctive relief, much less argue that such requests are not "prospective" in nature.  In fact, their briefing on this exception amounts to a parenthetical on a Sixth Circuit decision "analyzing plaintiff's claims under the *Ex Parte Young* . . . exceptions to the Eleventh Amendment" (*id.*, PageID.149), but they otherwise fail to make *any* arguments as to why Gaither's express requests for injunctive relief in his complaint fall outside the scope of this exception.

Here, Gaither's complaint seeks the following forms of injunctive relief:

> Plaintiff seeks an injunction directing that he be transferred to a facility in the Lower Peninsula Michigan similarly situated prior to defendants submitting a Retaliatory Transfer to the Upper Peninsula specifically to PUNISH Plaintiff, cause him to [lose] his $80-$100 dollar a month Work Assignment, compensate back pay, reinstate work assignment with amounts equal to his earnings prior to Defendants['] retaliation. . . .
>
> Plaintiff seeks injunction directing Termination of all Government

13

>   Actors involved in Felony Assaulting, Sexual Assaulting Plaintiff.
>   Def. Thompson, Def. Michaels, (Unknown) Sergeants in order to
>   protect and prevent any other prisoners from being subject to Staff
>   Felony Assaults by Government Actors.
>
>   Plaintiff seeks injunction, terminating Def. Salisbury for committing
>   the felony of forgery . . . .

(ECF No. 1, PageID.23-24).

Defendants – as the party moving for dismissal of Gaither's official capacity claims solely based on sovereign immunity – should have addressed head-on whether the aforementioned exception to Eleventh Amendment immunity applies to these specific requests for injunctive relief. Unfortunately, Defendants instead wholly ignored the issue, including whether Gaither's requests are prospective in nature or threaten an invasion of Michigan's sovereignty. *See Va. Office for Prot. & Advocacy*, 563 U.S. at 255 ("Respondents have advanced no argument that the relief sought in this case threatens any . . . invasion of [the State's] sovereignty"); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the courts to . . . put flesh on its bones."). At a minimum, Gaither's request for reinstatement to a similar prison work assignment prior to the retaliatory transfer is "prospective in nature." *See Diaz*, 703 F.3d at 964.[5] Without regard to the merits (or lack thereof) of his claims, the face of the

---

[5] On August 16, 2021, Gaither filed a Notice of Change of Address, stating that he was transferred to Macomb Correctional Facility in Lenox, Michigan, on "8-12-21." (ECF No. 30, PageID.193). Thus, the Court notes that, while his request for injunctive relief to be transferred back to "a facility in the Lower Peninsula Michigan" could also be construed as seeking prospective injunctive relief

complaint at least *alleges* an ongoing violation of his federal constitutional rights and relief

seeking to end such violation.  *See Verizon Md., Inc.*, 535 U.S. at 646; *Coeur d'Alene Tribe*

*of Idaho*, 521 U.S. at 281.

Thus, at this stage of the proceedings, the Court cannot determine that dismissal of

the official capacity claims for injunctive relief on Eleventh Amendment immunity grounds

is appropriate.  Accordingly, while Defendants are entitled to dismissal of Gaither's official

capacity claims seeking monetary damages based on sovereign immunity, dismissal of his

official capacity claims seeking injunctive relief should be denied at this time.

## 2.  Partial Summary Judgment on Retaliation Claims

In Michigan's correctional facilities, prisoner grievances are generally governed by

MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "General

Grievance Policy").  (ECF No. 26-2, PageID.154).  According to the General Grievance

Policy, "[g]rievances may be submitted regarding alleged violations of policy or procedure

or unsatisfactory conditions of confinement which directly affect the grievant, including

alleged violations of this policy and related procedures."  (*Id.* at ¶ E).  Moreover, "[a]

grievant shall not be penalized in any way for filing a grievance except as provided in this

policy for misusing the grievance process.  Staff shall avoid any action that gives the

appearance of reprisal for using the grievance process."  (*Id.* at ¶ K).

A Michigan state prisoner must first complete the process outlined in the General

---

to end his continued "cruel and unusual punishment" of being housed at URF in retaliation for
filing a grievance, in violation of his First and Eighth Amendment rights, that request now appears
to be moot.  In any case, again, Defendants do not address the issue of prospective injunctive relief
at all, much less request supplemental briefing on a mootness issue.

Grievance Policy – including pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct.  (*Id.* at ¶ B).  If a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance.  (*Id.* at ¶¶ P, V).  If the prisoner is dissatisfied with the Step I response, he may submit a grievance appeal to the Step II Grievance Coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due.  (*Id.* at ¶ BB).  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III.  (*Id.* at ¶ FF).[6]

### a.  Exhaustion of Retaliation Claims

In their motion, Defendants argue that Gaither only exhausted one grievance alleging a retaliatory transfer through Step III of the general grievance process, but that "all other claims raised in Gaither's complaint were not exhausted and are therefore subject to dismissal." (ECF No. 26, PageID.147-48).  In support of their argument, Defendants attach to their motion the General Grievance Policy, as well as salient general grievance

---

[6] The Court notes that, while Gaither alleges several claims of retaliatory sexual assault and/or sexual harassment against Defendants (and even attaches to his complaint the PREA Grievance and related Step II denial), Defendants' summary judgment materials do not include any salient documents related to the PREA grievance process.  Significant to this case, in April 2016, Michigan's correctional facilities adopted a separate two-step PREA grievance process for allegations of sexual misconduct, governed by MDOC Policy Directive 03.03.140, entitled "Prison Rape Elimination Act (PREA) and Prohibited Sexual Conduct Involving Prisoners" (the "PREA Policy").  *Does 8-10*, 945 F.3d at 955.  Thus, unlike general grievances, a "Step II decision [under the two-step PREA grievance process] constitutes the [MDOC's] final determination" on a PREA Grievance, and is all that is necessary to exhaust such claims.  *Id.* at 957.  As discussed below, Defendants present *no evidence* establishing that Gaither did not file and/or appeal any PREA grievances for his claims of retaliatory sexual assaults through the two-step PREA grievance process, which ultimately proves fatal to their request for summary judgment on these claims.

documents and a summary report.  (ECF Nos. 26-1 through 26-3, PageID.152-68).

Relevant here, a copy of Gaither's "MDOC Prisoner Step III Grievance Report" (the "Step III Report") shows that Gaither pursued the 17B Grievance through Step III.  (ECF No. 26-3, PageID.164).[7]  A copy of Gaither's "Prisoner/Parolee Grievance Form" for the 17B Grievance reflects that he challenged his transfer to URF "in retaliation of a Step I grievance (ARF:17/02/20019/PREA P) that [he] had filed at ARF," in violation of his "First Amendment" rights.  (*Id.*, PageID.168).  After this Grievance was denied at Step I, his appeal was denied at Step II (*Id.*, PageID.166-67), and his appeal was again denied at Step III (*Id.*, PageID.165).

In response to their motion, Gaither argues that Defendants committed "fraud on the Court" by stating that he had only exhausted one grievance – the 17B Grievance – even though he "attached both his grievances to the initial complaint," *i.e.*, the 17B Grievance (ECF No.1, PageID.36-38), *and* the PREA Grievance (ECF No. 1, PageID.32-35).  (ECF No. 28, PageID.173-75).  He asserts that Defendants intentionally failed to disclose the PREA Grievance, which was "fully exhausted against Def. Lance Thompson" and the protected conduct that "initiated the retaliation and collusion by all defendants."  (*Id.*, PageID.175).

In their reply, Defendants contend that the Step III Report plainly reflects that "the only grievance received at Step III arising out of ARF was [the 17B Grievance]."  (ECF

---

[7] The Step III Report also shows that he had pursued two other grievances in 2015 and 2016 through Step III, both of which fall outside the relevant time period at issue in his complaint, and thus could not have exhausted any of his present claims.

No. 29, PageID.181).  According to Defendants, because Gaither argues that the PREA Grievance "initiated the retaliation," its filing "was the *protected conduct* which formed the basis of his retaliation claim, and as such could not and did not exhaust any claims of retaliation against MDOC Defendants."  (*Id.*) (emphasis in original).

Here, Defendants have established through the Step III Report that the only relevant *general* grievance exhausted in this case is the 17B Grievance regarding the retaliatory transfer.  (ECF No. 26-3, PageID.164).  Gaither's response does not at all challenge the accuracy of the Step III Report, so it is undisputed that Gaither did not exhaust any other relevant claims through the three-step general grievance process.

Nonetheless, as discussed below, Gaither also alleges claims that can or must be exhausted through procedures other than the three-step general grievance process.  Thus, given that Defendants seek summary judgment on "all other claims raised in Gaither's complaint," it is unclear why they limit their motion to addressing only claims governed by the General Grievance Policy's three-step process.

First, Gaither alleges under "Claim #2" of his complaint that Pankhurst, in retaliation for Gaither's filing a grievance against Thompson, "forged a false destruction of state property misconduct report . . . [for] which plaintiff received sanctions of 3 days [loss of privileges]."  (ECF No. 1, PageID.14-15).  For whatever reason, Defendants, who bear the burden of proving non-exhaustion, do not at all mention this claim of a retaliatory misconduct report and appear to mistakenly assume that their production of the Step III Report sufficiently covers this claim.  In relevant part, the General Grievance Policy provides that "[d]ecisions made in hearings conducted by hearing officers of the State

18

Office of Administrative Hearings and Rules, including property disposition, . . . [and] minor misconduct hearings" are "non-grievable issues" that "shall be rejected by the grievance coordinator."   (ECF No. 26-2, PageID.154-55, ¶ F).   Thus, courts have recognized that misconduct reports are non-grievable, and "the only avenue for challenging [] misconduct reports is a hearing." *Siggers v. Campbell*, 652 F.3d 681, 694 (6th Cir. 2011); *see also Ayotte v. Stemen*, No. 15-13826, 2019 WL 2219739, at *5 (E.D. Mich. Feb. 27, 2019), *report and recommendation adopted*, No. 15-13826, 2019 WL 1349607 (E.D. Mich. Mar. 26, 2019).

In light of well-settled caselaw establishing that a claim of retaliatory misconduct reports is "non-grievable," Gaither could not have grieved this claim under the three-step general grievance process, so the Step III Report has no bearing on this particular claim. *See Siggers*, 652 F.3d at 694.   However, because Defendants rely solely on the Step III Report without otherwise presenting evidence (or even arguing) that Gaither failed to properly challenge this "non-grievable" retaliatory misconduct report through a hearing, they failed to meet their initial summary judgment burden of demonstrating the absence of a material question of fact as to exhaustion of this particular claim. *See Celotex*, 477 U.S. at 325; *Alexander*, 576 F.3d at 558.

As to claims of retaliatory sexual assaults, Defendants acknowledge Gaither's allegations that "when he stated that he would file a grievance, Thompson assaulted him by performing a strip search" (ECF No. 26, PageID.139), and that Gaither then "pursued a PREA grievance that initiated the retaliation . . . by MDOC Defendants."   (ECF No. 29, PageID.181).   Despite recognizing that the "MDOC processes PREA grievances under

19

P.D. 03.03.140 'Prohibited Sexual Conduct Involving Prisoners'" – which is distinct from the General Grievance Policy – Defendants fail to provide a copy of the PREA Policy, let alone the PREA Grievance or any salient documents related to the PREA's two-step grievance process. (ECF No. 29, PageID.181). Simply put, Defendants, who bear the burden of proving non-exhaustion, have conceded that Gaither filed the PREA Grievance against Thompson on a claim that he was sexually assaulted through a strip search in retaliation for threatening to file a grievance, but they do not even argue, much less present evidence, that he failed to exhaust the PREA Grievance.[8]

Moreover, the above analysis similarly applies to Gaither's remaining claims in his complaint (and reiterated in his response brief) that Defendants "sexually assault[ed] him" by performing "strip searches" on several occasions in retaliation for filing the PREA Grievance. (ECF No. 1, PageID.12, 17; ECF No. 28, PageID.175). Again, Defendants do not present any evidence related to the PREA Policy and the PREA grievance process. Instead, they rely solely – and fatally – on the Step III Report documenting **general grievances governed by the General Grievance Policy**, even though it would not include information about **PREA grievances governed by the PREA Policy**. Indeed, Gaither's

---

[8] To the extent Defendants assert that the PREA Grievance could not have served as the basis for exhaustion of Gaither's initial claim of a *retaliatory* sexual assault against Thompson because the PREA Grievance had not yet been filed (and so there was no protected conduct to *retaliate* against at that time), this argument is without merit. Gaither clearly alleged that Thompson initially retaliated against him for *threatening* to file a grievance, and courts have held that, "when it comes to protecting First Amendment rights, including the right to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threatening to file one." *Carter v. Dolce*, 647 F. Supp. 2d 826, 834 (E.D. Mich. 2009); *see Brockman v. McCullick*, No. 17-10399, 2018 WL 3207902, at *4 (E.D. Mich. June 29, 2018) ("[a prisoner's] right to file a grievance has been read more broadly to include activities such as threatening to file a grievance").

PREA Grievance – which he alleges was initially filed as a general grievance but converted to a PREA grievance by the MDOC and fully exhausted – does not appear on the Step III Report, either.  (*See* ECF No. 1, PageID.27; ECF No. 26-3, PageID.164).

Finally, it is worth noting that Defendants essentially make a *single* argument (in their reply brief responding to an accusation of fraud)[9] that specifically touches on Gaither's retaliatory sexual assault claims: "the PREA Grievance . . . which formed the basis of his retaliation claim . . . could not and did not exhaust any claims of retaliation against MDOC Defendants."  (ECF No. 29, PageID.181).  While true that the PREA Grievance could not exhaust retaliatory conduct that occurred after its filing on "1-19-17," Defendants still have not presented *any evidence* showing that Gaither did not *subsequently* file and/or appeal *other* PREA grievances against Defendants.  Ultimately, it is the Defendants who bear the burden of proving non-exhaustion, and they simply fail to establish (or even argue) that Gaither did not file and appeal separate PREA grievances for each of his alleged retaliatory sexual assault claims.[10]  Thus, Defendants failed to meet

---

[9] While Defendants' failure to address the PREA Grievance in their motion is insufficient for establishing their entitlement to summary judgment on the initial retaliatory sexual assault claim against Thompson, there is no evidence in the record amounting to "fraud on the court" as alleged in Gaither's response brief.

[10] The Court notes that the General Grievance Policy in effect at the relevant time period in this case contemplates that the three-step general grievance process "includes . . . complaints of conduct in violation of [the PREA Policy]." (ECF No. 26-2, PageID.154, ¶ B).  However, Gaither alleges (and Defendants do not dispute) that he "initially filed a [general] grievance [against Thompson] which the facility converted to a PREA grievance," suggesting that the PREA's two-step grievance process was applied here.  In any case, Defendants neither reference nor cite to this provision of the General Grievance Policy, nor do they make any arguments as to which policy would have (or should have) applied to his claims.  Even assuming the General Grievance Policy applied, Defendants present no evidence showing that Gaither did not (or could not) exhaust his other retaliatory claims of sexual assault as PREA grievances under the two-step PREA process,

their initial summary judgment burden of demonstrating the absence of a genuine dispute of material fact regarding exhaustion on any of Gaither's claims alleging retaliatory sexual assaults. *See Celotex*, 477 U.S. at 325; *Alexander*, 576 F.3d at 558.

b. Unavailability of Administrative Remedies

For the reasons discussed above, Defendants have not established that Gaither failed to exhaust his (1) claim of a retaliatory misconduct report; and (2) any claims of retaliatory sexual assaults. However, Defendants have met their initial burden of establishing that all of Gaither's remaining retaliation claims were not exhausted through the three-step general grievance process based on their production of the Step III Report, which only reflects proper exhaustion of his one retaliatory transfer claim.

In his response to Defendants' motion, Gaither argues that Defendants "thwarted exhaustion of [his] claims by refusing to afford [him] an Administrative Hearing," even though he was "required to exhaust his retaliation claims involving Misconducts during the Misconduct Hearing" under *Siggers v. Campbell*, 652 F.3d 681 (6th Cir. 2011). (ECF No. 28, PageID.173). Thus, he asserts that he was "unable to exhaust his retaliation claims" because Defendants "never issued [him] a Misconduct, Notice of Intent etc., and never conducted any Administrative Hearings . . . contrary to" MDOC policy and procedures. (*Id.*). In short, he contends that Defendants "never intended to actually follow MDOC Policy & Procedure" and instead rendered "unavailable" his administrative remedies by "repeatedly 5 times placing [him] in segregation, assaulting [him], sexually assaulting

---

just as he was required to do with the initial PREA Grievance – and none of which would show up on the Step III Report.

[him], without disciplinary hearings." (*Id.*, PageID.175).

In reply, Defendants argue that Gaither's filing of the 17B Grievance during the relevant time period belies his "conclusory allegations that the grievance process was unavailable to him" as a result of his being placed in segregation. (ECF No. 29, PageID.181-82). They further assert that Gaither "has not identified any specific conduct by MDOC Defendants to prevent him from accessing the grievance process or any specific incidents where he was prevented from accessing the grievance process." (*Id.*, PageID.182).

Here, because the Court has already determined above that summary judgment is not warranted on claims that were "non-grievable" or potentially subject to the two-step PREA grievance process, the only remaining issue is whether Gaither was unable to exhaust his other retaliation claims because the three-step general grievance process was "unavailable" to him. Gaither has failed to make this showing.

First, his assertion that he "was unable to exhaust his retaliation claims" because Defendants "never issued [him] a Misconduct, Notice of Intent etc., and never conducted any Administrative Hearings" reflects a fundamental misunderstanding of *Siggers* and the grievance procedures governing his remaining general retaliation claims. (ECF No. 28, PageID.173). As discussed above, while *Siggers* controls Gaither's "non-grievable" claim of a retaliatory misconduct report *issued against him*, his remaining claims alleging non-sexual retaliatory misconduct *by Defendants* are clearly grievable under the General Grievance Policy's three-step grievance process.

Specifically, because Gaither's claims allege that Defendants subjected him to a

series of retaliatory acts for filing a grievance that were in violation of normal policy and procedures, they are squarely governed by the General Grievance Policy's provisions that (1) "a grievant shall not be penalized in any way for filing a grievance," and (2) "grievances may be submitted for alleged violations of policy or procedure . . . including alleged violations of this policy and related procedures." (ECF No. 26-2, PageID.154-56, ¶¶ E, K). Together, these provisions make clear that penalizing (or retaliating against) Gaither "in any way" for his filing the PREA Grievance is a violation of the General Grievance Policy, and thus constitutes misconduct subject to the three-step general grievance process.[11]

Finally, perhaps due to a misunderstanding of the applicable exhaustion procedures, Gaither does not specifically argue that the MDOC's three-step general grievance process was unavailable to him. Even if he had raised such an argument based on his placement in segregation, neither his complaint nor response brief contain any allegations that he ever attempted to file a general grievance against Defendants for these retaliatory acts (other than the 17B Grievance for the retaliatory transfer), and certainly no evidence of such attempts. In short, absent any *evidence* that Defendants prevented him from accessing the three-step general grievance process, his argument regarding the "unavailability" of

---

[11] For example, Gaither raises a claim alleging that, in an effort to place him in segregation in retaliation for filing the PREA Grievance, Salisbury "fabricated" and "forged" a "False Notice of Intent" and denied him the opportunity to contest it, which violated MDOC policies. (ECF No. 1, PageID.19). Because this claim asserts misconduct involving an intentional disregard or violation of the normal policies and procedures regarding segregation as punishment for his filing a grievance, this conduct was grievable under the General Grievance Policy's three-step process.

administrative remedies is simply unfounded.[12]  Thus, Gaither fails to raise a question of

material fact that Defendants prevented him from accessing the MDOC's general grievance

process.

## III.   CONCLUSION

For the reasons set forth above, on Defendants' Motion for Partial Summary

Judgment on the Basis of Exhaustion and to Dismiss **(ECF No. 26)**, **IT IS**

**RECOMMENDED** that:

- Partial summary judgment be **DENIED** as to Gaither's claim of a retaliatory misconduct report, as well as claims of retaliatory sexual assaults, and **GRANTED** as to all other claims (other than his retaliatory transfer claim which Defendants agree was exhausted).

- Dismissal of Gaither's official capacity claims based on Eleventh Amendment immunity be **DENIED** as to his claims for injunctive relief, and **GRANTED** as to his claims for monetary damages.

Dated: October 25, 2021                           s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

---

[12] Courts have made clear that, in responding to a summary judgment motion, the opposing party may not rest on its pleadings, but must make an affirmative showing with proper *evidence* to defeat the motion.  *Alexander*, 576 F.3d at 558 (internal quotations omitted).  Otherwise, in a case like this one, the exhaustion requirement would be rendered meaningless, as a prisoner who actually failed to file a grievance or appeal through the grievance process could always simply claim to have been prevented from doing so.  While this view could theoretically incentivize prisons to "prevent" prisoners from filing grievances and/or appeal forms, caselaw reflects that adequate protections exist against such concerns.  *See, e.g., Young v. Jackson*, No. 12-12751, 2013 WL 8178397, at *8-9 (E.D. Mich. Nov. 13, 2013) (rejecting defendants' failure to exhaust argument where plaintiff provided copies of numerous letters requesting a Step II grievance appeal form from the appropriate grievance coordinator, but allegedly was not provided one); *Graham v. Chicowski*, No. 16-12258, 2017 WL 3097803, at *5 (E.D. Mich. Apr. 18, 2017) (finding that plaintiff raised a question of fact as to the "availability" of the grievance process where he provided copies of several letters he had written and evidence demonstrating that his family made calls and wrote letters on his behalf to advance his grievance).  The issue boils down to the prisoner presenting sufficient *evidence* to at least raise a material question of fact that he took reasonable steps to properly exhaust his grievance – and Gaither has simply failed to do so here.

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 25, 2021.

s/Eddrey O. Butts<br>
EDDREY O. BUTTS<br>
Case Manager